## IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF ALABAMA

| | | |
|---|---|---|
| MICHAEL VAN DEELEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NUMBER: |
| v. | ) | |
| | ) | |
| BLOOMBERG L.P. and | ) | 20-239 |
| DANIEL GILL | ) | |
| | ) | |
| Defendants. | ) | |

## **COMPLAINT**

COMES NOW, plaintiff Michael Van Deelen, and for his Complaint against the defendants for defamation (libel) and false light invasion of privacy states as follows:

### **PARTIES**

1.  Defendant Bloomberg L.P. (hereinafter, "Bloomberg") is a privately held financial, software, data and media company formed under the laws of the state of Delaware with its principal place of business being New York City.  Bloomberg Law is a product of Bloomberg that is a for-profit, subscription-based service that provides online legal content, legal research, proprietary company information and news information to attorneys, law students and other legal professionals and interested persons in Alabama and elsewhere.  Bloomberg has does substantial business from its Bloomberg Law product in the state of Alabama and in the Southern District of Alabama since 2010.

2.  Defendant Daniel Gill is a resident of Maryland who is employed as a Bloomberg Law reporter by Bloomberg.

3.  Plaintiff Michael Van Deelen is a resident of Spring, Texas.

## JURISDICTION AND VENUE

4.  Jurisdiction in this Court is proper pursuant to 28 U.S.C. Section 1332 because there exists complete diversity of the parties and because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.  The plaintiff seeks compensatory damages in excess of $200,000.00, exclusive of interest and costs, punitive damages in an amount to be determined and any case-specific, discretionary, damages awarded by the Court.

5.  Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b)(2), because a  substantial part of the events or omissions giving rise to the claim occurred in this District.  In defamation actions, venue is proper where the defamatory material was published and upon information and belief that location in this matter is in the State of Alabama and in the Southern District of Alabama.  The defendants have knowingly published two defamatory articles about plaintiff in the State of Alabama and in the Southern District of Alabama since March 18, 2020.  Furthermore, the defendants have informed plaintiff that they will likely publish additional articles about the plaintiff in the future.  Given the fact that the first two articles (published March 18, 2020 and March 25, 2020) were maliciously published by the defendants who knew, or should have known, that the alleged facts contained in the articles were untrue and were intended to defame the plaintiff and color the plaintiff in a false light, any future articles concerning the plaintiff published by the defendants are likely to be of the same defamatory nature.

## PRELIMINARY

6.  Plaintiff is a competent pro se litigant.  For example, in Van Deelen v. Eudora Amateur Baseball Association, plaintiff successfully changed the Association's rules so

that, in part, girls could play youth baseball on what had previously been boys-only teams.  (Plaintiff does not have, and has never had, any daughters.)  In Van Deelen v. City of Eudora and Board of County Commissioners of Douglas County, Kansas, plaintiff successfully sued to force the replacement of undersized culverts in Eudora, Kansas, with bridges in order to eliminate neighborhood flooding in that city.  Finally, plaintiff won an appeal before Judge Neil Gorsuch of the 10th Circuit Court of Appeals in a case that involved taxpayer rights during property tax appeal hearings.  That case, Van Deelen v. Johnson, *497 F.3d 1151*, was cited during the U.S. Senate Confirmation Hearings for Judge Gorsuch's successful appointment to the United States Supreme Court.

7.  Plaintiff is a Phi Beta Kappa graduate of Stanford University (Economics) and received his Master's Degree (Management/Finance) from M.I.T..  Plaintiff is also a member of Mensa.

## BACKGROUND

8.  Plaintiff is representing himself as a Party In Interest during McDermott International's Chapter 11 bankruptcy preceding in the U.S. District Court for the Southern District of Texas (case number 20-30336).  Kirkland & Ellis is one of the firms representing and advising the company.  Kirkland became upset with plaintiff because on February 27, 2020, plaintiff filed a pleading asking the Court to order a criminal inquiry pursuant to 18 U.S.C. Section 158(d) and 18 U.S.C. Section 3057 into improper, criminal, activities pursued by McDermott and its advisors (which include Kirkland) before and during the pendency of the bankruptcy proceedings.

9.  During the Plan Confirmation Hearing held on March 12, 2020, plaintiff
further angered Kirkland when he objected to the reading of Kirkland's expert witness
reports favoring bankruptcy into the record.  Instead, plaintiff made the experts testify
during the hearing so that he could ask them questions.  This took a lot of time.  One of
the Kirkland attorneys, Joshua Sussberg, was sitting next to plaintiff in the courtroom.
The longer the testimony took, the angrier Mr. Sussberg appeared.  Eventually, Mr.
Sussberg began to glare at plaintiff and subsequently told plaintiff 'You are disgusting!"
and made other insults to plaintiff.  At the time, plaintiff did not know Mr.
Sussberg's name.

10.  After the hearing was over, plaintiff went to the restroom.  As plaintiff was
entering the restroom, Mr. Sussberg was coming out.  Plaintiff politely asked him for his
name.  Mr. Sussberg would not give plaintiff his name.  He became very angry and once
again told plaintiff 'You are disgusting!' and also told plaintiff 'You are a fool!'  Mr.
Sussberg then went around a corner toward the elevators.  For some reason, Mr. Sussberg
turned around and came storming back to the restroom area.  He aggressively charged
plaintiff and stopped just a couple of inches from plaintiff and once again began to berate
plaintiff.  Plaintiff was very frightened.  Plaintiff is a 70 year-old senior citizen and Mr.
Sussberg is a muscular person who appears to be in his late 30's or early 40's.  Mr.
Sussberg bumped plaintiff in the chest and left.

11.  Plaintiff was determined to find the name of this person so plaintiff could
complain about his terrible behavior, including his assault of plaintiff.  Plaintiff got on the
Kirkland website and found Sussberg's picture which identified him as Joshua Sussberg.
Plaintiff then sent Mr. Sussberg a courtesy email asking him if he was the one who had

sat across from plaintiff at the March 12, 2020, Plan Confirmation Hearing. Plaintiff gave Mr. Sussberg until Wednesday, March 18, 2020, to reply. On Tuesday, March 17, 2020, Kirkland and one of McDermott's other attorneys filed a false, defamatory, motion on behalf of McDermott with the bankruptcy court falsely accusing plaintiff of a host of improprieties. Plaintiff believes Kirkland's motion (hereinafter the "motion" or the "McDermott motion") was an attempt to 'head plaintiff off at the pass' in plaintiff's desire to complain about (or possibly even sue) Mr. Sussberg.

12. Kirkland subsequently published the motion to the internet and Bloomberg Law (hereinafter, 'Bloomberg') found it. Without first checking the motion's false, fraudulent, accusations, Bloomberg edited and cut and pasted parts of the motion and omitted, intentionally or through a negligent failure to investigate, exculpatory facts in the attempt to defame the plaintiff and color the plaintiff in a false light through false statements, innuendo and demonization.

13. Bloomberg published the manufactured article (hereinafter, the "article") on March 18, 2020.

14. The article, in its original font and type size, follows:

**THE BLOOMBERG ARTICLE**

# "Shareholder of Bankrupt McDermott Accused of Threats, Vulgarity

March 18, 2020, 6:01 PM
- Company says shareholder has history of abusive behavior
- Shareholder denies all accusations

A shareholder of bankrupt engineering giant McDermott International Inc. who allegedly called a judge "son of a bitch" during a recent hearing could be facing sanctions for his behavior.

Michael Van Deelen made vulgar remarks inside and out of the courtroom and appeared at the home of a former company director, rattling his wife, according to an emergency motion McDermott filed Tuesday in the U.S. Bankruptcy Court for the Southern District of Texas. Lawyers for the company are asking the court to order him to show cause why he shouldn't be sanctioned.

Van Deelen can be heard calling Chief Judge David R. Jones a "son of a bitch" on an audio transcript, McDermott said. He also allegedly confronted the company's bankruptcy attorney near the courthouse restroom.

Van Deelen declined Bloomberg Law's request for comment, but denied the allegations in a filing Wednesday.

He didn't refer to the judge in any vulgar or disrespectful matter, and urged the court to listen to the audio transcript from the hearing.

He acknowledged speaking with the company officer's wife outside their home, but he was at all times polite, he said. "At no time during the encounter was Van Deelen disrespectful," nor did he ever raise his voice, he said. The officer's wife didn't submit an affidavit or other evidence in support of McDermott's claims, he said.

Van Deelen said the court lacks jurisdiction over his out-of-court conduct and he wasn't violating any law or court order. He also was "terribly frightened" by McDermott's lawyer during a hallway exchange.

But Van Deelen has a history of abusive and sanctionable behavior, McDermott said. During a 2006 case in the Western District of Missouri, he interrupted and argued with the judge, "made flippant and disrespectful remarks," and even fabricated evidence to support his claims, according to the company's motion.

The engineering, procurement, and construction company filed Chapter 11 in January to reduce overwhelming debt tied to its $3.5 billion acquisition of Chicago Bridge & Iron Co. in 2018.

The court approved McDermott's reorganization plan March 14, giving most of the company's equity to secured creditors. The court also approved a sale of McDermott unit Lummus Technology for more than $2.7 billion.

A group of shareholders, whose interests will be wiped out under McDermott's proposed reorganization plan, had objected to the plan as unfair and possibly in bad faith. Other creditors also objected.

The case is In re McDermott International, Inc., Bankr. S.D. Tex., No. 20-30336, Emergency Motion 3/17/20."

**ANALYSIS OF THE BLOOMBERG ARTICLE**

15.  The following repeats the above article, but with plaintiff's comments discussing specific false and defamatory statements in *italics*.

# Shareholder of Bankrupt McDermott Accused of Threats, Vulgarity

*Non-specific title accusing plaintiff of unnamed, non-specific, threats and vulgarity.  Title is in 24 point bold, twice the size of the 12 point, non-bold, article. Title is intended to defame plaintiff, whose name is given not far below, and color him in a false light.  The title sets the stage through innuendo for the demonization of the plaintiff in the following article.*

March 18, 2020, 6:01 PM

- Company says shareholder has history of abusive behavior

*Statement is false.  Nowhere in the McDermott motion does McDermott say plaintiff 'has history of abusive behavior'.  Bloomberg is editing and conflating different statements in the motion to defame plaintiff and color him in a false light.*

- Shareholder denies all accusations

A shareholder of bankrupt engineering giant McDermott International Inc. who allegedly called a judge "son of a bitch" during a recent hearing could be facing sanctions for his behavior.

*Bloomberg intentionally or negligently reported this alleged 'fact' even though plaintiff denied it during a call with Bloomberg reporter Daniel Gill before the article was published.  Furthermore, the motion reported that plaintiff could be heard calling the Court a 'son-of-a-bitch' on the audio clip of the hearing between sections 3:19:29 and 3:21:20.  The audio clip is readily available to anyone who wants to download it from the Court's docket sheet and plaintiff informed Mr. Gill how to access it before the article was published.  Plaintiff not only denied to Mr. Gill that he has ever called the Court a 'son-of-a-bitch', he also informed Mr. Gill of the section of the audio clip where the offending words were allegedly spoken. All Mr. Gill had to do was listen to the clip (as well as the entire audio if he so chose) and he would have seen that plaintiff did not call the Court a 'son-of-a-bitch'.  Instead, Mr. Gill chose to intentionally or negligently not investigate plaintiff's denial of  the assertions of the motion and simply tell Bloomberg's*

*readers that plaintiff had called the Court a 'son-of-a-bitch' in order to further defame the plaintiff and color the plaintiff in a false light.*

Michael Van Deelen made vulgar remarks inside and out of the courtroom

*Misleading and edited in the attempt to defame the plaintiff and color him in a false light. A reader of Bloomberg's statement would assume, especially given the tone and tenor of the Bloomberg article, that plaintiff had made vulgar remarks inside and outside the courtroom on multiple occasions (dates). The McDermott motion, however, (falsely) accuses plaintiff of only making said remarks on March 12, 2020. Furthermore, plaintiff made it clear to Mr. Gill that plaintiff did not make any vulgar remarks inside or outside of the courtroom on any occasion.*

and appeared at the home of a former company director, rattling his wife, according to an emergency motion McDermott filed Tuesday in the U.S. Bankruptcy Court for the Southern District of Texas.

*False and Misleading. The former company director referred to is Stuart Spence. In his Response to McDermott's motion, plaintiff (Van Deelen) stated:*

> *"Van Deelen subpoenaed Mr. Stuart Spence to testify during the 3/12/20 Plan Confirmation Hearing. Van Deelen hired Ms. Lisa Moberg, a process server, to serve Mr. Spence. Mr. Spence accepted service on 2/19/20.*
> *In reviewing the Proof of Service, Van Deelen noticed that the description of Mr. Spence given by Ms. Moberg stated that he was 65 years old with white hair. Van Deelen called Ms. Moberg, who confirmed the description of Mr. Spence.*
> *Van Deelen believed, from a recent picture of Mr. Spence that plaintiff had seen, that Mr. Spence was in his early 50's and bald. Accordingly, Van Deelen thought that maybe the wrong person had been served, especially since the address of service was not the address given in public records as Mr. Spence's recent address. Van Deelen and Ms. Moberg tried several times to call Mr. Spence to ask if he was the right person to be served. Mr. Spence did not answer his phone or return the calls.*
> *To avoid having possibly served the wrong person, Van Deelen went to the Proof of Service address and rang the bell. A middle-aged lady answered the bell. Van Deelen politely asked if Mr. Stuart Spence was home. The lady said 'no'. Van Deelen then **apologetically and very politely** told the lady that he had had a summons issued to Mr. Spence at that address and that Van Deelen was afraid the wrong person may have been served. Van Deelen then politely asked the lady if Mr. Stuart Spence lived there. She said 'yes'. Van Deelen then politely asked the lady if Mr. Spence had worked at McDermott. She replied 'yes'. At that point, Van Deelen apologized for having bothered the lady and left.*
> *At no time during the encounter with the lady was Van Deelen disrespectful. Van Deelen never raised his voice. The lady never refused to*

*answer Van Deelen's questions.  She never appeared 'rattled'.  If the lady would have asked Van Deelen to leave, he would have immediately done so.  Mrs. Spence has not presented an affidavit on behalf of the movants' claims that alleges any wrongdoing by Van Deelen.*

*It was within Van Deelen's civil rights to speak to Mrs. Spence.  The Court had not previously directed Van Deelen to stay away from Mr. or Mrs. Spence.  In fact, the Court declined to hear Van Deelen's explanation of what had occurred with Mrs. Spence when Van Deelen proffered testimony concerning their interaction during the 3/12/20 Plan Confirmation Hearing.*

*If Mr. Spence would have answered his phone or returned Ms. Moberg's or Van Deelen's calls, Van Deelen would not have had to go to his residence to see if he was the right person to have been served."*

*When Mr. Gill called plaintiff on 3/18/20 before he had published the article, plaintiff told Mr. Gill the above information and also referred Mr. Gill to his Response to McDermott's motion.  Mr. Gill intentionally or negligently failed to check the facts, including plaintiff's Response to the McDermott motion, and instead reported the false allegation included in the motion in order to further defame and color the plaintiff in a false light.  Nowhere in the Bloomberg article does Mr. Gill state the reason why plaintiff was at the Spence house.  Mr. Gill and Bloomberg clearly attempt to cause the reader to assume that plaintiff went to the Spencer house to threaten or intimidate Mr. Spence and/or his wife.  Nothing could be further from the truth.*

Lawyers for the company are asking the court to order him to show cause why he shouldn't be sanctioned.

*Technically false.  McDermott's motion asked the Court for plaintiff to appear and show cause why he should not be held in contempt of court, not sanctioned.  However, the motion does ask the Court to sanction the plaintiff as well as hold him in contempt.*

Van Deelen can be heard calling Chief Judge David R. Jones a "son of a bitch" on an audio transcript, McDermott said.

*Bloomberg intentionally or negligently reported this alleged 'fact' even though plaintiff denied it during a call with Bloomberg reporter Daniel Gill before the article was published.  Furthermore, the motion reported that plaintiff could be heard calling the Court a 'son-of-a-bitch' on the audio clip of the hearing between sections 3:19:29 and 3:21:20.  The audio clip is readily available to anyone who wants to download it from the Court's docket sheet and plaintiff informed Mr. Gill how to access it before the article was written.  Plaintiff not only denied to Mr. Gill that he has ever called the Court a 'son-of-a-bitch', he also informed Mr. Gill of the section of the audio clip where the offending words were allegedly spoken.  All Mr. Gill had to do was listen to the clip (as well as the entire audio if he so chose) and he would have seen that plaintiff did not call the Court a 'son-of-a-*

*bitch'.  Instead, Mr. Gill intentionally or negligently chose to not investigate plaintiff's denial of the assertions of the motion and simply tell Bloomberg's readers that plaintiff had called the Court a 'son-of-a-bitch' in order to further defame and color the plaintiff in a false light.*

He also allegedly confronted the company's bankruptcy attorney near the courthouse restroom.

*False, misleading, edited, incomplete and intended to defame and color the plaintiff in a false light.  Once again, Mr. Gill edits the statement to make plaintiff appear in the worst possible light.  'Confronted' implies some sort of physical action.  Who was the attorney confronted?  McDermott has an army of bankruptcy attorneys.  When was the confrontation?  What was said?  What was done?  The word 'confronted' does not once appear in the McDermott motion but Mr. Gill inserts it into his report to further demonize the plaintiff in the eyes of its readers.  The tone and tenor of the Bloomberg article leaves it up to the imaginations of its readers to assume the worst about plaintiff.*

*During his 3/18/20 conversation with Mr. Gill before the article was published, plaintiff referred Mr. Gill to his Response to the McDermott motion.  Mr. Gill intentionally or negligently failed to read the Response and to subsequently check and clarify the 'facts' behind his allegations. In his Response, plaintiff (Van Deelen) stated:*

*"During the 3/12/20 hearing, a person now known as Mr. Sussberg sat directly across the isle between the two conference tables from Van Deelen.
Through Van Deelen's objection, the Debtor witnesses were made to testify in person instead of having their written statements adopted into the record.  This was time consuming.  As the witnesses testified and time proceeded, Van Deelen noticed Mr. Sussberg becoming more and more agitated.  Finally, Mr. Sussberg, without any cue from Van Deelen, said to Van Deelen and all who could hear: "You are disgusting!" and other insults.  Van Deelen looked at him and told him to be quiet.  The Court heard this exchange because the record will show that the Court told Mr. Sussberg and Mr. Van Deelen to 'hold it down' or words to that effect.
After the hearing, Van Deelen did not follow Mr. Sussberg anywhere, including the restroom.  Like many at the end of the long hearing, Van Deelen needed to use the restroom.  As Van Deelen was entering the restroom, Mr. Sussberg was leaving the restroom.  Due to the unprofessional behavior exhibited by Mr. Sussberg towards Van Deelen during the hearing as detailed above, Van Deelen wanted to determine Mr. Sussberg's name so he could make a formal complaint against him.  Mr. Van Deelen said to Mr. Sussberg: 'May I have your name, sir?"  Mr. Sussberg angrily refused to give Van Deelen his name.
Instead, Mr. Sussberg again told Van Deelen: "You are disgusting!"  He also told Van Deelen other things including: "You are a fool!" Mr. Sussberg is a young, stocky, man.  Van Deelen is a 70 year-old senior citizen.  Mr. Sussberg's*

*words, tenor and posture caused Van Deelen to be afraid for his safety. Van Deelen began to have heart palpitations and he remained near the restroom while Sussberg left and went down the hallway towards the elevators. All of a sudden, Sussberg came rushing back down the hallway and towards the restroom area where Van Deelen was and angrily charged Van Deelen. Mr. Sussberg then began calling Van Deelen names again. Mr. Sussberg stood only inches away from Van Deelen, shouting at Van Deelen. Van Deelen was terrified by Mr. Sussberg's actions. Mr. Sussberg eventually left and again went down the hallway towards the elevators.*

*Van Deelen, terribly frightened, remained in the restroom area for a period of time until he hoped Mr. Sussberg had left. Eventually Van Deelen looked down the hall toward the elevators and saw that Mr. Sussberg had in fact left. Van Deelen was extremely frightened and upset. So upset, in fact, that he could not locate his vehicle in the parking garage near the courthouse that he had used many times before. Van Deelen had to ask a garage employee for assistance in finding his car."*

*Assuming that Mr. Gill was referring to Mr. Sussberg in his statement about plaintiff's 'confrontation' near the courthouse restroom, which we cannot be sure of, not one sentence of plaintiff's account of his interaction with Mr. Sussberg appeared in the Bloomberg article written by Mr. Gill. In their article, Mr. Gill and Bloomberg cherry pick words and phrases from the motion and then edit them together in the attempt to defame plaintiff, destroy plaintiff's reputation and color him in the worst possible light.*

Van Deelen declined Bloomberg Law's request for comment,

*False, misleading and intended to defame and color the plaintiff in a false light. Plaintiff did not decline Bloomberg Law's request for comment. Mr. Gill called plaintiff at approximately 5:00 p.m., Eastern Daylight Time, on 3/18/20. Plaintiff agreed to speak to Mr. Gill. Mr. Gill abruptly terminated the conversation at approximately 5:15, Eastern Daylight Time, after only fifteen minutes and before plaintiff had finished commenting about the McDermott motion and why it was false and misleading. Mr. Gill said he had to end the conversation because he had to meet a deadline to publish the article. The article was published approximately forty-five minutes later, at 6:01 Eastern Daylight time. Mr. Gill essentially admits that he did not get the entirety of plaintiff's comments because he (Mr. Gill) was under a deadline to publish the article!*

but denied the allegations in a filing Wednesday.

He didn't refer to the judge in any vulgar or disrespectful matter, and urged the court to listen to the audio transcript from the hearing.

11

*Misleading.  While plaintiff has never referred to the judge in a vulgar or disrespectful manner, what plaintiff specifically told Mr. Gill was that plaintiff did not call the judge a 'son-of-a-bitch'.*

He acknowledged speaking with the company officer's wife outside their home, but he was at all times polite, he said. "At no time during the encounter was Van Deelen disrespectful," nor did he ever raise his voice, he said. The officer's wife didn't submit an affidavit or other evidence in support of McDermott's claims, he said.

*Incomplete and misleading.  See the above discussion concerning plaintiff's visit to the Spence home.  The article gives no indication of why plaintiff was at the Spence home.  It is left to the reader's imagination to believe that plaintiff was at the Spence home for some inappropriate or unlawful purpose.*

Van Deelen said the court lacks jurisdiction over his out-of-court conduct and he wasn't violating any law or court order.

He also was "terribly frightened" by McDermott's lawyer during a hallway exchange.

*Incomplete and edited.  Plaintiff told Mr. Gill that he was terribly frightened because Mr. Sussberg, a McDermott lawyer and advisor, assaulted him outside a restroom following the March 12, 2020, Plan Confirmation Hearing.  Plaintiff explained the events surrounding the assault to Mr. Gill and also referred Mr. Gill to plaintiff's Response to the McDermott motion for a detailed explanation of Mr. Sussberg's verbal and physical assault of plaintiff.  Mr. Gill did not include Mr. Sussberg's alleged assault of plaintiff in the article in order to maximize the defamation and coloring of plaintiff in a false light.  To include Mr. Sussberg's alleged assault of plaintiff in the article would cause its readers to believe plaintiff was only defending himself from Mr. Sussberg, which is what happened.*

*Neither did Mr. Gill include the ages or physical descriptions of plaintiff and Mr. Sussberg in the article.  As plaintiff told Mr. Gill, and as described in plaintiff's Response to the McDermott motion, plaintiff is a 70 year-old senior citizen while Mr. Sussberg is a muscular young man in his late 30's or early 40's.  Telling the article's readers this fact would certainly cause them to doubt that plaintiff initiated any type of confrontation with Mr. Sussberg (or anyone else).  This information was left out of the article because the intent of the article was to mislead its readers in order to defame and color the plaintiff in a false light to the largest extent possible.*

But Van Deelen has a history of abusive and sanctionable behavior, McDermott said. During a 2006 case in the Western District of Missouri, he interrupted and argued with the judge, "made flippant and disrespectful remarks," and even fabricated evidence to support his claims, according to the company's motion.

*False, fraudulent, misleading and edited in order to defame the plaintiff and color him in a false light.  McDermott's motion did not say plaintiff (Van Deelen) 'has a history of **abusive** (emphasis added) and sanctionable behavior', it said he 'has a history of sanctionable behavior'.  That was the only McDermott claim that has the word 'history' in it.  Mr. Gill edited the McDermott claim, adding in the false claim that plaintiff has a history of **abusive** behavior in order to maximize the defamation and coloring in a false light of plaintiff.*

*McDermott's motion does claim that plaintiff has a history of sanctionable behavior.  The word 'History' misleadingly implies that plaintiff has been sanctioned more than one time.  In fact, plaintiff has been sanctioned only one time which was fourteen years ago in the case cited in McDermott's motion.  However, neither McDermott in their motion nor Bloomberg in its article state that the Eighth Circuit Court of Appeals overturned part of the sanction.  Prior to the publication of the Bloomberg article, plaintiff explained the single instance of being sanctioned to Mr. Gill and also referred Mr. Gill to plaintiff's Response to the McDermott motion which explained the single instance of being sanctioned. Mr. Gill intentionally or negligently ignored  plaintiff's explanation of his single instance of being sanctioned, including the partial overturn of the sanction by the Court of Appeals, and failed to insert the relevant information into his article.  As we have seen above, Mr. Gill was careful to **never** include in his article information which would show the plaintiff in a positive light.*

*Plaintiff has never fabricated evidence, regardless of what the Western District of Missouri Court ruled.*

### THE SECOND ARTICLE

16.  On March 25, 2020, Bloomberg published a second article that continued to defame plaintiff and color the plaintiff in a false light.  The most egregious statement in the article implies that plaintiff said during the March 12, 2020, Plan Confirmation Hearing that he was going to shoot someone, either during or after the hearing.

17.  Bloomberg's allegation that plaintiff said during the March 12, 2020, Plan Confirmation Hearing that he was going to shoot someone, either during or after the hearing, is false, fraudulent, misleading and edited.  Bloomberg intentionally or negligently failed to investigate the veracity of this allegation.  They did not contact plaintiff, either before or after the second article was published, and give plaintiff a

chance to comment on or deny any of the second article's allegations.  Furthermore, plaintiff had previously referred Bloomberg and Mr. Gill to the audio transcript (free to the public online) of the March 12, 2020, Plan Confirmation Hearing to disprove the allegation that plaintiff had called the Court a "son-of-a-bitch" during that hearing, as noted above.  All Bloomberg and Mr. Gill had to do was listen to the audio and they would have learned that plaintiff did not say during the hearing that he was going to shoot someone, either before or after the hearing.  Ignoring the evidence before them, and failing to seek plaintiff's denial, Bloomberg published the false allegation in the attempt to maximize the defamation of plaintiff and the coloring of him in a false light.

18.  Plaintiff is a teacher.  He will never find another teaching job when a simple Google search by a school district's HR department turns up the Bloomberg article that implies plaintiff said he was going to shoot someone.  And he will almost certainly be fired from his present position if his employer reads the article.

19.  On April 9, 2020, pursuant to Alabama Code 6-5-186, plaintiff made written demand upon the defendants for a public retraction of the matters (articles) published; and the defendants have failed or refused to publish within five days, in as prominent and public a place or manner as the matters published occupied, a full and fair retraction of such matters.

20.  Bloomberg's March 18, 2020, and March 25, 2020, articles are still on the company's website as of the day of filing of the instant action.

**FUTURE ARTICLES**

21.  The defendants have informed plaintiff that they will likely publish additional articles about the plaintiff in the future.  Given the fact that the first two articles

(published March 18, 2020 and March 25, 2020) were maliciously published by the defendants who knew, or should have known, that the alleged facts contained in the articles were untrue and were intended to defame the plaintiff and color the plaintiff in a false light, any future articles concerning the plaintiff published by the defendants are likely to be of the same defamatory nature.

## COUNT 1
## DEFAMATION (LIBEL) PER SE

22.  The foregoing is incorporated herein by reference.

23.  In their articles, the defendants published false and defamatory statements of alleged facts concerning the plaintiff that harmed the plaintiff by exposing the plaintiff to public ridicule and contempt, by lowering the reputation of the plaintiff in the estimation of those who read the false articles and by deterring others from associating with the plaintiff.  The defendants, in their articles, maliciously injured plaintiff's reputation by subjecting the plaintiff to disgrace, ridicule, odium and contempt in the estimation of his friends, acquaintances and the public.

24.  The defendants published their untrue, unfair and biased articles even though they had failed to investigate the alleged facts of the articles and even though plaintiff had provided evidence to them prior to the publishing of the articles that their alleged facts were untrue.  The defendants published their articles with recklessness, reckless disregard for the truth and with prior information regarding their falsity.

25.  The defendants published their articles with knowledge that the matters published were false or with reckless disregard of whether the matters were false or not. At least five days prior to the commencement of this action, plaintiff made written demand upon the defendants for a public retraction of the matters published.  The

defendants have failed or refused to publish within five days, in as prominent and public a place or manner as the matters published occupied, a full and fair retraction of such matters.

26.  The plaintiff has been damaged by the actions of the defendants described herein.  Damages, among other things, include mental suffering, shame, humiliation, ridicule, disgrace, odium, contempt, loss of association and loss of employment opportunities.

WHEREFORE, plaintiff seeks compensatory damages in excess of $200,000.00, exclusive of interest and costs, punitive damages in an amount to be determined and any case-specific, discretionary, damages awarded by the Court.

## COUNT 2
## DEFAMATION (LIBEL)

27.  The foregoing is incorporated herein by reference.

28.  In their articles, the defendants published false and defamatory statements of alleged facts concerning the plaintiff that harmed the plaintiff by exposing the plaintiff to public ridicule and contempt, by lowering the reputation of the plaintiff in the estimation of those who read the false articles and by deterring others from associating with the plaintiff.  The defendants, in their articles, maliciously injured plaintiff's reputation by subjecting the plaintiff to disgrace, ridicule, odium and contempt in the estimation of his friends, acquaintances and the public.

29.  The defendants published their untrue, unfair and biased articles even though they had failed to investigate the alleged facts of the articles and even though plaintiff had provided evidence to them prior to the publishing of the articles that their alleged

16

facts were untrue.  The defendants published their articles with recklessness, reckless disregard for the truth and with prior information regarding their falsity.

30.  The defendants published their articles with actual malice and with knowledge that the matters published were false or with reckless disregard of whether the matters were false or not.  At least five days prior to the commencement of this action, plaintiff made written demand upon the defendants for a public retraction of the matters published.  The defendants have failed or refused to publish within five days, in as prominent and public a place or manner as the matters published occupied, a full and fair retraction of such matters.

31.  The plaintiff has been damaged by the actions of the defendants described herein.  Damages, among other things, include mental suffering, shame, humiliation, ridicule, disgrace, odium, contempt, loss of association and loss of employment opportunities.

WHEREFORE, plaintiff seeks compensatory damages in excess of $200,000.00, exclusive of interest and costs, punitive damages in an amount to be determined and any case-specific, discretionary, damages awarded by the Court.

## COUNT 3
## COLORING IN A FALSE LIGHT
## (FALSE LIGHT INVASION OF PRIVACY)

32.  The foregoing is incorporated herein by reference.

33.  In their articles, the defendants invaded plaintiff's privacy by placing him in a false, but not necessarily defamatory, position in the public eye (hereinafter referred to as "false light").  The false light in which the defendants placed the plaintiff would be highly offensive to a reasonable person.  In placing plaintiff in a false light, the defendants had

knowledge of or acted in reckless disregard as to the falsity of the publicized matters and the false light in which the plaintiff would be placed.

34. The defendants published their untrue, unfair and biased articles even though they had failed to investigate the alleged facts of the articles and even though plaintiff had provided evidence to them prior to the publishing of the articles that their alleged facts were untrue. The defendants published their articles with recklessness, reckless disregard for the truth and with prior information regarding their falsity.

35. The plaintiff has been damaged by the actions of the defendants described herein. Damages, among other things, include mental suffering, shame, humiliation, ridicule, disgrace, odium, contempt, loss of association and loss of employment opportunities.

WHEREFORE, plaintiff seeks compensatory damages in excess of $200,000.00, exclusive of interest and costs, punitive damages in an amount to be determined and any case-specific, discretionary, damages awarded by the Court.

## COUNT 4
## INJUNCTIVE RELIEF

36. The foregoing is incorporated herein by reference.

37. Plaintiff continues to be harmed as the libelous, defamatory and false light content published by the defendants continues to be published on defendant Bloomberg's website.

38. Plaintiff is being damaged by the publication of this content, which the defendants know to be false and which is published with malicious intent for the express purpose of damaging the plaintiff's reputation and coloring the plaintiff in a false light.

WHEREFORE, plaintiff seeks injunctive relief in the form of a permanent injunction ordering the defendants to remove all libelous, defamatory and false light content regarding the plaintiff from their website and all other means of publication available to them and to cease and desist from republication of the same or the publishing of additional defamatory or false light content in the future.

## JURY DEMAND

39.  The plaintiff demands a trial by jury on all triable issues.

WHEREFORE, plaintiff respectfully requests the following relief:

A.  A trial by jury as detailed herein.

B.  Compensatory damages in excess of $200,000.00, exclusive of interest and costs, as detailed herein.

C.  Punitive damages in an amount to be determined as detailed herein.

D.  Any case-specific, discretionary, damages awarded by the Court as detailed herein.

E.  A permanent injunction as detailed herein.

F.  For such other, further and different relief as the Court may deem just and proper.

/s/ Michael Van Deelen
Michael Van Deelen
Plaintiff Pro Se
16215 Friar Circle
Spring, TX 77379
832-562-0723
michaelvandeelen@gmail.com